0051

CONTINENTAL MORTGAGE INVESTORS, Respondent, v. QUAIL RUN ASSOCIATES; J. P. Maloney, Jr.; Alvin L. Harmon; Thomas A. Spain; Ryan Pinckney Construction Specialties, Inc.; Comprehensive Land Planning Consultants, Inc.; and Beaufort County, South Carolina, Defendants, of whom Quail Run Associates; J. P. Maloney, Jr.; Alvin L. Harmon; Thomas A. Spain are Appellants.

Appeal of QUAIL RUN ASSOCIATES, J. P. Maloney, Jr., Alvin L. Harmon, Thomas A. Spain.

(312 S. E. (2d) 272)

Court of Appeals

*Robert W. Dibble, Jr.*, and *Robert E. Stepp* of *McNair, Glenn, Konduros, Corley, Singletary, Porter & Dibble*, Columbia, *for appellants.*

*Howell V. Bellamy, Jr.* of *Bellamy, Rutenberg, Copeland, Epps, Gravely, & Bowers*, Myrtle Beach, and *George L. Palmer* of *Westmoreland & Palmer*, Hilton Head Island, *for respondent.*

Jan. 23, 1984.

CURETON, Judge:

This case arises out of a mortgage foreclosure action affecting real and personal property located on Hilton Head Island, South Carolina. Continental Mortgage Investors (CMI) seeks a foreclosure judgment based on various alleged defaults under the terms of several notes, mortgages and loan agreements. Quail Run Associates (QRA) counterclaimed alleging a prior breach of the Sound Modification of Loan Agreement (Second Agreement) and seeks actual damages or, alternatively, a set-off against the monies it owes CMI.

The case was heard before a special referee who recommended foreclosure be granted and QRA's counterclaim for damages and the set-off be denied. The special referee's findings and recommendations were adopted by the circuit judge who entered judgment of foreclosure against QRA and denied its claim for the set-off and damages. No appeal was taken from the order disposing of the counterclaim and set-off.

The issues on this appeal challenge the sufficiency of the evidence to support the trial court's findings that (1) the

Second Modification of Loan Agreement was ambiguous, necessitating the admission of parol evidence; (2) CMI did not materially breach the Second Agreement; (3) CMI did not waive QRA's breach; and (4) CMI's failure to continue performance under the Second Agreement did not prevent QRA's performance, thus discharging QRA's contract obligations.

This is an action in equity. *Collier v. Green*, 244 S. C. 367, 137 S. E. (2d) 277 (1964). Since the trial judge concurred in the findings of the special referee, the "two-judge" rule is activated, binding this Court to the findings unless they are found to be without evidentiary support or against the clear preponderance of the evidence. *Townes Associates Ltd. v. City of Greenville*, 266 S. C. 81, 221 S. E. (2d) 773 (1976). Our review of the record and briefs convinces us that the special referee's findings of fact, concurred in by the trial court, are supported by the evidence. We therefore affirm the judgment of the trial court.

In 1972, CMI loaned Sea Pines Plantation Company (SPPC) $2,700,000 to construct an apartment complex on Hilton Head Island. The terms and conditions of this loan were contained in a Loan Agreement and note. Payment of the note was secured by a first mortgage on the Hilton Head property. In 1973, SPPC sold the project to QRA for the sum of $600,000 receiving $60,000 in cash and accepting a purchase money note in the amount of $540,000 which was secured by a second mortgage on the property. QRA did not assume liability for the first mortgage held by CMI, but received title subject to the first mortgage. Coincidental with this purchase, QRA leased the apartments back to SPPC. CMI consented to these transactions.

During the early part of 1974, SPPC defaulted on the loan to CMI and in its lease payments to QRA. Both CMI and QRA found it advantageous to avoid CMI's foreclosure of SPPC's loan. They therefore entered into a contract called a Second Modification of Loan Agreement.

Under the terms of this Second Agreement, SPPC assigned the $540,000 note it held from QRA to CMI and was released from all liability by both CMI and QRA. CMI agreed to accept repayment of the $2,700,000 note from QRA though QRA assumed no personal liability on the debt. QRA also agreed to convert the apartments into condominium units. CMI obli-

gated itself to help fund the conversion by adding a $500,000 reserve fund to the original loan of $2,700,000. This fund was to be drawn against by QRA pursuant to the provisions of the Second Agreement. The three notes CMI held from QRA had a maturity date of September 30, 1977.

The Second Agreement was unusual in that it created a nonrecourse loan that left CMI with the real property as its only security. Its main thrust was to make the project self-liquidating. As QRA converted the apartments into condominium units, it was to sell them, using the proceeds to repay the loans. CMI had no other source to look to for repayment. To afford some protection against QRA's delay in conversion and sale of the condominium units, CMI incorporated a sales timetable into the Second Agreement. The parties agreed that QRA's failure to adhere to this timetable would constitute a default. QRA's first benchmark was the sale of eleven units by March 31, 1976.

QRA sold no condominium units by March 31, 1976, though several units had been converted. In fact, no sales were ever achieved prior to the institution of this action on November 4, 1977.

On June 5, 1976, CMI gave QRA written notice of default for its failure to meet the March 31, 1976 sales deadline. Thereafter, on June 23, 1976, QRA notified CMI that it considered CMI in breach of the Second Agreement for having failed to meet funding requests. On May 19, 1977, CMI sent a second default letter to QRA. Pursuant to the Second Agreement, the loans matured on September 30, 1977. Demand for payment was made on October 30, 1977. No payment was made. CMI then commenced this action to foreclose its mortgage lien.

The central controversy between the parties focuses on who materially breached the terms of the Second Agreement first. It is the position of QRA that CMI first breached the Second Agreement by its failure to fund the February draw request. On the other hand, CMI contends, and the trial court found, that CMI did not breach its obligation to fund the request because CMI made a timely and proper objection to the draw request. CMI also points out that QRA's failure to sell a single condominium by March 31, 1976 and its default in the payment of the notes constituted a material breach of the Second Agreement, supporting a judgment of foreclosure.

In its first assignment of error, QRA asserts, contrary to the court's finding, that CMI did in fact breach the Second Agreement by failing to fund the request because the evidence establishes that CMI was obligated under the Second Agreement to provide up to $500,000 and that this provision was of the essence of the contract. We find no merit in QRA's assignment of error.

It is undisputed that CMI had the initial obligation to make conversion funds available to QRA. It is also clear that according to the Second Agreement, CMI had the right to withhold funds pending resolution of its objections to the draw requests. Paragraph 14(b)(3) entitled "Conditions Precedent to Disbursement," provides that "Borrower shall provide Lender such information and documents and on such forms as Lender may reasonably require to substantiate such funding request of the borrower." Paragraph 30 also states that "All requests by Borrower for a disbursement . . . shall be deemed approved unless within 15 days after receipt of such written request from Borrower, Lender advises Borrower of its objection to the request."

The express language of the Second Agreement conditions CMI's obligation to disburse conversion funds on QRA's provision of requested documentation. QRA's assertion that CMI had an unconditional obligation to provide up to $500,000 is contrary to the evidence presented.

In the same vein, QRA further asserts the court erred in finding that CMI was relieved of the obligation to fund the February draw request and thus did not breach the contract. QRA maintains that even if CMI had the right to withhold funds pending resolution of its objections to the draw request, the evidence shows that CMI failed to timely communicate its objections to QRA. Further, QRA argues, CMI's objections were a camouflage for the fact that CMI was bankrupt and unable to perform its obligation to provide the funding. We cannot agree with QRA.

As noted above, Paragraph 30 of the Second Agreement provided that QRA's funding requests were deemed approved unless within 15 days after CMI's receipt of them, CMI advised QRA of objections to the requests. The evidence supports the court's finding that QRA submitted the draw requests on February 23, 1976 and CMI objected on March 1, 1976.

The testimony of witnesses for both CMI and QRA reveals that Greene, an official of CMI, communicated objections to Mahon, an official of QRA, in a telephone conversation on March 1, 1976. At that time, CMI requested substantiation of certain budget items submitted by QRA in the draw requests. QRA mailed budget documentation on March 3, 1976. This documentation failed to resolve CMI's objections. We fail to see the basis for QRA's contention that no timely objection was communicated to it.

Likewise, we find there is evidentiary support in the record for the finding that CMI had money with which to fund the February draw request. QRA points to two facts which it contends show that CMI breached the Second Agreement because it was unable to perform. First, on March 8, 1976, CMI filed a petition in bankruptcy for reorganization. Second, CMI's accountants' report indicates that on March 31, 1976, CMI had cash on hand of $470,000 but liabilities of $612,754,000.00.

These facts are not persuasive when balanced against evidence that CMI extended $18,807 in partial funding to QRA between March 15 and May 7, 1976. Further, the same accountants' report noted above reveals that a year earlier CMI had cash of $950,000.00 and liabilities of $712,000,000.00. Yet it had completely funded all four of QRA's previous draw requests. Finally, an official of CMI testified that funding of several projects, including that of QRA, proceeded without difficulty.

QRA also challenges the validity of CMI's objections to the draw request by directing this Court's attention to a CMI Internal Memorandum dated March 22, 1976. The Memorandum, sent by CMI's vice president of the loan division to his supervisor, stated in relevant part "[T]his is a properly prepared and submitted draw request for a loan program which is not currently in default."

Neither the special referee nor trial judge mentioned this Memorandum in his decision. The Memorandum, however, was just one of several items of evidence considered by the special referee in determining whether CMI made valid and timely objections to the February draw request and whether those objections were ever cleared by QRA. While at first blush, an examination of the Memorandum may indicate that on March 22, 1976 CMI had no objections to the February draw

request, the special referee apparently believed CMI's witnesses that this Memorandum was simply "file doctoring." The assessment of the credibility of witnesses is within the unique province of the special referee who heard their testimony. The special referee found that the objections were never cleared and there is direct testimony from CMI's witness that supports this finding. This finding was concurred in by the trial judge and based upon our limited scope of review, we are compelled to affirm such finding.

QRA further assigned error to the trial court's finding that provisions of the Second Agreement were ambiguous, thus necessitating the admission of parol evidence. In particular, QRA objects to the court's admission of documentation of preliminary negotiations between the parties. The documentation tended to show their expectation that CMI would only need to provide $80,000.00 (later revised to $120,000.00) in funding for the project conversion. The evidence supported CMI's position that it reasonably objected to the February draw request since it had already provided $75,467.26 in funds.

QRA argues that the Second Agreement was not ambiguous in its requirement that CMI provide funds up to a total of $500,000.00. Our review of QRA's assignment of error is thwarted by the trial court's failure to specify the provision of the Second Agreement it found ambiguous. The only clue to the basis of the court's findings is in its statement that "there does exist ambiguity as it relates to the interpretation and intended interaction between several of the critical provisions of the loan documents so that evidence as to what the parties intended those provisions to mean is essential for a full understanding of their intended operation."

This Court agrees with QRA that the provision requiring CMI to provide conversion funding up to an amount of $500,000.00 is unambiguous. The effect of admitting testimony that CMI expected to have to fund only $80,000.00, however, was not prejudicial to QRA because it addressed only the reasonableness of CMI's objection to funding the request. The reasonableness of the objection had already been established by persuasive evidence that CMI expressed its opposition to the continual ballooning of line items in the draw request submitted by QRA. Therefore, we find that even though the court erred in finding the Agreement ambiguous, the error was harmless.

QRA next contends that even if it defaulted on its obligation to sell eleven condominium units by March 31, 1976, the Court erred in failing to find that its default was waived by CMI's partial funding of the request after March 31. Several facts convince us, however, that no waiver occurred.

First, the Second Agreement, paragraph 25, expressly reserves CMI's right at any time while a default existed to declare the loan in default. Second, the partial funding after knowledge that the default existed was characterized by CMI as "preservation funding." According to CMI's uncontroverted evidence, such funding is an industry-wide practice designed to protect the value of the asset while a default situation exists. It is settled that a waiver is inferred from conduct only when the conduct evidences that a party does not stand upon its right to declare a default. *Williams v. Philadelphia Life Insurance Co.*, 112 S. C. 436, 100 S. E. 157 (1910). Preservation funding evidences no intent to relinquish any right to declare the loan in default.

Moreover, QRA has not shown how it was prejudiced by this funding, or that the partial funding after March 31, 1976 lulled it into believing that CMI had waived the March 31, 1976 sales deadline. *See Satcher v. Woodmen of the World Life Insurance Society*, 199 S. C. 59, 18 S. E. (2d) 523 (1942).

In a further assignment of error, QRA asserts the court's finding that its performance of its obligations under the Second Agreement was not prevented by CMI's failure to fully fund the February draw request is unsupported by the evidence. We must disagree.

It is settled that a party who precludes the other from performing under the contract cannot avail himself of such non-performance. *Propst Construction Co. v. N. C. Department of Transportation*, 56 N. C. App. 759, 290 S. E. (2d) 387 (1982); *Whitt v. Godwin*, 205 Va. 797, 139 S. E. (2d) 841 (1965). In this case, however, QRA's own official in charge of the conversion project testified that CMI's failure to fund the February draw request had "no negative impact" whatsoever on QRA's sales program before March 31, 1976.[1] This testimony, combined with other evidence, fully supports the Court's finding on this issue.

---

[1] The Special Referee found that QRA had converted approximately 20 units by March 31, 1976 and had the necessary sales staff to perform its obligation to sell the units.

We have reviewed the complete record in this case, including the three-volume transcript, the four volumes of exhibits, and the excellent report of the special referee in which the trial court concurred. We find no error.

Accordingly, the judgment of the circuit court is

Affirmed.

SHAW and GOOLSBY, JJ., concur.